UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ELKANAH ROGERS,

     Plaintiff,

     v.

ALTERNATIVE RESOURCES
CORPORATION,

     Defendant.

HONORABLE JOSEPH E. IRENAS

CIVIL NO. 04-6232 (JEI)

**OPINION**

**APPEARANCES:**

LAW OFFICE OF CHRISTIAN A. PEMBERTON, P.C.
By: Christian A. Pemberton, Esq.
416 Sicklerville Road
P.O. Box 308
Sicklerville, New Jersey 08081
    Counsel for Plaintiff.

BLANK ROME LLP
By: Christine V. Bonavita, Esq.
Jennifer Hale Eagland, Esq.
210 Lake Drive East
Woodland Falls Corporate Park, Suite 200
Cherry Hill, New Jersey 08002
    Counsel for Defendant.

**IRENAS**, Senior District Judge:

Plaintiff Elkanah Rogers ("Rogers") brought the instant action against his former employer, Defendant Alternative Resources Corporation ("ARC"), alleging discriminatory treatment, discriminatory termination and retaliatory termination, in violation of New Jersey's Law Against Discrimination ("NJLAD"). Presently before the Court is ARC's Motion for Summary Judgment.

1

**I.**

Rogers is a 54 year old African American male.  He began working for ARC on July 1, 1997.  ARC provides information technology management and staffing management services to its clients.  Rogers was hired by ARC to work on its contract with Hewlett-Packard ("HP"), which required ARC to provide on-site technical support to HP customers across the country.

Rogers's official job title was Customer Engineer ("CE").  As a CE, Rogers was responsible for taking calls to service a variety of HP equipment.  He was employed in ARC's Mid-Atlantic region, which encompassed New Jersey, Pennsylvania, Delaware, Maryland, Virginia, North Carolina, and South Carolina.  His primary service area was the Philadelphia metropolitan and southern New Jersey area.

On February 24, 2003, Rogers filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging unfair treatment in the workplace based on his race in violation of Title VII, 42 U.S.C. § 2000e-2.  He contended that he received less training and was sent outside his commuting area more often than his white co-workers.  On June 30, 2004, the EEOC issued a finding of no cause, and gave Rogers a right to sue letter.  Rogers did not further pursue his Title VII claims.

In December, 2003, HP discontinued its contract with ARC.  This triggered layoffs by ARC across the country, and

2

particularly in the Mid-Atlantic region, where the company laid off all but two or three employees.  These employees worked out of North and South Carolina and were retained for a period of several weeks only at HP's request.  At the time of the layoffs, and Rogers' termination, he was the only employee reporting out of the southern New Jersey area.

Rogers filed his First Amended Complaint in the Superior Court of New Jersey, Burlington County, on October 21, 2004.  He alleges discrimination in the terms of his employment based on his race and age, discriminatory discharge on the basis of his race and age, and retaliatory discharge based upon his filing a complaint with the EEOC, in violation of NJLAD.  ARC timely removed the case to the District of New Jersey.[1]

## II.

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitles to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

---

[1] This Court has subject matter jurisdiction based upon diversity of citizenship, pursuant to 28 U.S.C. § § 1332 and 1441.

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving part. *Pollock v. Am. Tel & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 248 (internal quotation and citation omitted; ellipsis in original).

## III.

The NJLAD provides that it is unlawful "[f]or an employer, because of the race . . . [or] age . . . of any individual . . . to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . ."  N.J.S.A. § 10:5-12(a). Furthermore, it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed

4

a complaint, testified or assisted in any proceeding under this act . . . ."  § 10:5-12(d).

When analyzing claims of employment discrimination under NJLAD based on circumstantial evidence, the Court must employ the *McDonnell Douglas-Burdine* burden shifting framework at the summary judgment stage.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Peper v. Princeton Univ. Bd. of Trustees*, 77 N.J. 55, 82-83 (1978) (applying *McDonnell Douglas-Burdine* framework to NJLAD claims).  This analysis consists of three steps.

First, the plaintiff must establish a *prima facie* case by a preponderance of the evidence.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  "The evidentiary burden at [the *prima facie* case] stage is rather modest: it is to demonstrate to the court that the plaintiff's factual scenario is compatible with discriminatory intent – i.e., that discrimination could be a reason for the employer's action."  *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 508 (3d Cir. 1996).  "Procedurally, courts have recognized that the *prima facie* case is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of defendant's efforts to dispute that evidence."  *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 448 (2005).  While a defendant may refute the plaintiff's allegations

5

and evidence in the second step of the *McDonnell Douglas-Burdine* framework, the Court may consider only the evidence presented by the plaintiff when determining the existence of a *prima facie* case.  *Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 54 (3d Cir. 1990) (stating defendant's arguments rebutting plaintiff's *prima facie* case belong in later stages of *McDonnell Douglas* and relying on plaintiff's evidence alone to find *prima facie* case satisfied).

The specific elements of the *prima facie* case will vary, depending on the type of discrimination alleged. *See McDonnell Douglas*, 411 U.S. at 802 n. 13 ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."); *Burdine*, 450 U.S. at 253-54 n. 6; *Murphy v. Hous. Auth. & Urban Redevelopment Agency of Atlantic City*, 32 F. Supp. 2d 753, 763-64 (D.N.J. 1999)(same reasoning for Title VII and NJLAD claims).

If a plaintiff succeeds in establishing his *prima facie* case, a presumption of discriminatory intent on the part of the defendant is created.  *Burdine*, 450 U.S. at 254.  The defendant must then produce evidence showing that it made the adverse employment decision "for a legitimate, nondiscriminatory reason." *Id.*  "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection," *id.* at 255, which would support a

jury finding that unlawful discrimination was not the cause of the adverse employment action. *Hicks*, 509 U.S. at 507. If the defendant comes forth with a legitimate reason for the employment action, the presumption of discrimination drops from the case, *Burdine*, 450 U.S. at 260, and the burden shifts to the plaintiff to prove by a preponderance of the evidence that the stated reason was pretextual. *Hicks*, 509 U.S. at 508.

In *Fuentes v. Perskie*, the Third Circuit explained that "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the . . . plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employers's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] nondiscriminatory reasons." 32 F.3d 759, 765 (3d Cir.1994) (internal citations omitted); *Romano v. Brown & Williamson Tobacco Corp.*, 284 N.J. Super. 543, 551 (App. Div. 1995) (citing *Fuentes*, 32 F.3d at 764-65).

## A.

Counts I and II of Rogers's Complaint allege discrimination

based upon race and age, respectively, in the terms and conditions of his employment.  These counts allege discrimination in three aspects of his employment: promotions, assignment of projects requiring long commutes, and training.[2]

In order to establish a prima facie case for allegations of

---

[2] It is unclear from Rogers's evidence which claims are based on race, age, or a combination of the two.

    "Q.   Can you tell me of any other instances [in addition to training] that made you think you were being racially discriminated against?

    A.    I don't know if every incident was for race.  So, no, I don't know of any other.  I don't know what their intentions were.

    Q.    Why don't you tell me of any other instances that make you think, as we sit here today, that you were being discriminated against on the basis of your race.

    A.    I don't have any others that I want to base on race.

    Q.    So, your claim is based on that you believe was a lack of training?

    A.    The training is the only thing I am basing on race.

    Q.    I think you said before you were being discriminated against on the basis of you age?

    A.    Yes, I do.

    Q.    I'm going to ask you the same question.  Can you tell me each instance of age discrimination that you think you were subjected to?

    A.    The one in which I was terminated.

    Q.    Anything else other than your termination?

    A.    That I can say for sure it was age?

    Q.    I'm not even asking for sure.  That you believe, sitting here today, that that's what you're basing your claim on.

    A.    My training could have had something to do with my age.  I'm not saying it did, but it could have.  But, I couldn't tell you that, overall, everybody didn't get training because of their age.  Because there were older people that did get training that I didn't."

(Rogers Dep. 84:17-86:2.)  Rogers also contends in his brief that was given less training and forced to commute in retaliation for his EEOC complaint, however, no such allegations are made in his Complaint.

disparate treatment, a plaintiff must establish that: (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment action. *El-Sioufi v. St. Peter's Univ. Hosp.*, 382 N.J. Super. 145, 167 (App. Div. 2005). Here, it is uncontested that Rogers was a member of a protected class, as he is an African-American and is over forty years of age. ARC contests the remaining three prongs as they apply to Rogers' claims regarding promotions, commuting distance and training.

1. Promotions

In order to establish a *prima facie* case in a failure to promote claim, the plaintiff must prove by a preponderance that: (1) he is within a protected class; (2) he sought and was qualified for the promotion; (3) he was rejected for the promotion; and (4) nonmembers of his protected class were treated more favorably - alternatively stated, that the promotion went to someone with equal or lesser qualifications who was not in the protected class. *Bennun v. Rutgers*, 941 F.2d 154, 170 (3d Cir. 1991); *Hodgkins v. Kontes Chemistry & Life Scis. Prod.*, No. Civ.A. 98-2783, 2000 WL 246422 (D.N.J. Mar. 6, 2000) (failure to promote claim based on gender under Title VII and NJLAD). Rogers

9

alleges that ARC failed to promote him to the position of Lead Customer Engineer ("LCE"), while Thomas Day ("Day"), who was white and younger, was promoted to LCE.

The first two prongs of Rogers's *prima facie* case are not contested here.  Rogers is a member of a protected class, as he is an African American and over 40 years of age.  He contends that there was no formal application process for promotion to LCE, but he testified that he told his supervisor "that if they were going to make a lead in [Rogers's] office, that [Rogers] would like the position."  (Rogers Dep. 142:12-14.)  *See E.E.O.C. v. Metal Service Co.*, 892 F.2d 341, 348 (3d Cir. 1990) ("Courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a *prima facie* claim of [discrimination], as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer."); *DeMaio v. Bed, Bath & Beyond of King of Prussia, Inc.*, No. Civ.A.2:03-CV-5957, 2005 WL 174842 at *4 (E.D. Pa. Jan. 25, 2005) (holding that a statement to the store manager expressing desire to train for a promotion was sufficient when there was no formal hiring process).  Moreover, Rogers appears to have been qualified to be a LCE.[3]  Rogers has thus satisfied the

---

[3] Rogers maintains that promotions to LCE were determined based on seniority.  He contends that he was the most senior person in the Moorestown office when the LCE position was initially created. While ARC has presented evidence that promotions to LCE were not based solely on seniority, it has not

10

relatively light burden of the first two prongs of the *prima facie* case.

Rogers has not established the third prong of his *prima facie* case – that he was rejected for a promotion.  While it is clear that Rogers was not promoted, he has not established that he was rejected for a promotion.  By Rogers's own admission, Day was not working in the Moorestown office at the time he was promoted to LCE.  It was not until after Day had been promoted that both he and Bruce Walter[4] ("Walter") were transferred from the Horsham, Pennsylvania, office to the Moorestown office.[5]  (Rogers Dep. 143:14-18.)  No one was promoted to LCE in Rogers's office, nor has Rogers presented any evidence that Day was

---

specifically argued that Rogers was not qualified for a promotion to LCE.

[4] Walter, a white man who was one year younger than Rogers, had more seniority than Day or Rogers but was also not promoted.

[5] Rogers contends that Day was promoted to LCE while working in either the Horsham or Chesterbrook, Pennsylvania office, when then-LCE Ryan Skelley took a job with Hewlett-Packard.  The record does not reveal the date that Day was promoted or when Day and Walter were transferred to Moorestown, and thus the Court cannot determine if temporal proximity between the two events would suggest a discriminatory motive.  It is clear from Rogers's evidence, however, that Day and Walter were transferred at some point before June 20, 2002, more than two years before Rogers's Complaint was filed.  (Pl.'s Br., Exs Vol. 2: Ex. 1)  As such, any claim based upon the theory that Day was transferred to avoid promoting Rogers is barred by NJLAD's two year statute of limitations.

11

transferred to Moorestown to avoid promoting him.[6]  Therefore,
Rogers fails to satisfy the third and fourth prongs of the *prima
facie* case, and summary judgment will be granted for ARC.


2. Commuting

Rogers alleges that ARC forced him to work outside of his
"commuting area" more often than his younger, white coworkers.[7]
In order to establish a *prima facie* case of discrimination based

---

[6] It appears that ARC based the promotion to LCE of an
employee on the need of the manager of a particular office, and
also based on region.  Dennis Kubiak, Director of Operations for
Defendant, testified:

"Q.  Do you know what factors would have been taken into
    consideration as to whether Mr. Rogers could have
    gotten a promotion from his customer engineer service
    technician post to a lead customer engineer post?
A.  Primary consideration would have been need.  A lead
    customer engineer role is to assist his manager in day-
    to-day operations.  If the manager needed an additional
    assistant, or if an individual that was a lead CE left
    the company, then the manager would be looking for a
    replacement or an additional technician.
    So, the primary would be need.  The secondary would be
    geographic.  These individuals assist with small
    clusters of their peer employees.  So the area – again,
    if there was a lead CE in a specific geographic area,
    we wouldn't need an additional unless the manager felt
    he had to have some more help."
(Kubiak Dep. 17:18-18:12.)

[7] In light of the discussion below, the Court need not decide
if a claim of disparate treatment could be based on required
commuting distance.  Given the facts of this case, it is not
clear whether Rogers experienced an adverse employment action.
*See* discussion *infra* at Section III.A.2.  By his own testimony,
employees who were sent outside of their normal area to take
calls were paid for their travel time, reimbursed for mileage and
tolls, and paid overtime for any hours worked in excess of 40
hours per week.  (Rogers Dep. 62-63)

12

on this allegation of disparate treatment, a plaintiff must prove by a preponderance that: (1) that he is a member of a protected class; (2) that he was qualified for the job; (3) that he was required to commute outside his normal work area; and (4) that employees not within his protected class were not required to commute outside their normal area. *See Mandel*, 373 N.J. Super. at 70; *McDonnell Douglas*, 411 U.S. at 802 n. 13; *Burdine*, 450 U.S. at 253-54 n. 6.

The first three prongs of the *prima facie* case are not contested here.  Rogers is a member of a protected class.  He maintains that he was qualified for his job and performed satisfactorily.[8]  (Compl. ¶ 17, Rogers Aff. ¶ 1.)  Rogers also alleges, and ARC does not deny, that he was required to travel outside his normal commuting area to Baltimore, Maryland, Washington, D.C., and New York, although he refused to go to New York on one occasion.  (Rogers Dep. 60:19-61:17; Rogers Aff. ¶¶ 34-40.)

Rogers has not established that employees not within his protected class were treated differently.  At his deposition, he specifically named four white employees who were also sent out of

---

[8] While Defendant denies the allegation that "Plaintiff, Elkanah Rogers, was a good employee who did a satisfactory job and met his employer's legitimate expectations" (Compl. ¶ 17), at this stage the record must be viewed in the light most favorable to the non-moving party, and there is little to no evidence indicating that Rogers was unqualified for the position he held.

their normal commuting area.  (Rogers Dep. 108-110.)
Additionally, on the occasion when Rogers refused to go to New
York, he was asked to assist Walter, a white co-worker, who was
also being sent to service equipment in New York.  (Rogers Dep.
134-136.)  He has presented no evidence that younger co-workers
were not required to commute or were asked to do so less
frequently than he was.  Given that Rogers's own testimony
confirms that his white co-workers were also sent outside of
their normal commuting area, he has failed to establish the
fourth prong of the *prima facie* case.  Summary judgment will be
granted for ARC on this aspect of his disparate treatment claims.


3.  Training

    Rogers contends that he received less training than his
younger, white co-workers.  In order to establish a *prima facie*
case for disparate training, a plaintiff must prove: (1) he was a
member of a protected class; (2) he was qualified for training;
(3) he applied for and was denied training; and (4) nonmembers of
his protected class received training.  *Bethea v. Ford Motor Co.*,
Civ. A. No. 92-844, 1993 WL 19705 at *7 (D.N.J. Jan. 25, 1993)
(disparate training claim based on race under Title VII and
NJLAD).

    As discussed above, Rogers has established the first two

prongs of his *prima facie* case.[9]  Rogers maintains, and ARC does
not deny, that training was provided at the discretion of an
employee's supervisors.  (Rogers Dep. 72:25-73:4.)  Rogers thus
need not demonstrate that he formally applied for training.  *See
DeMaio*, 2005 WL 174842 at *4 (holding that when there is no
formal application process, no application is required).

Rogers has also presented evidence that his white co-workers
were given more and better training than he received.  (Pl.'s
Exs. Vol. 1: Ex. 1.)  In particular, he appears to have been
qualified to service fewer types of equipment than his white co-
workers.  Rogers also contends that the particular types of
equipment he was not trained on, namely the HP Design Jets, were
the newer, more advanced machines, whereas his training was on
older machines that were becoming obsolete.  He acknowledges that
he was scheduled for training on the HP Design Jets once, but
contends that he was unable to attend the training because his
flight to the training location was cancelled due to bad weather,
and ARC never rescheduled the training.  (*Id.*; Rogers Aff. ¶¶ 4,
11-32.)

As Rogers has established his *prima facie* case, the burden
now shifts to ARC to produce a nondiscriminatory reason for this
disparity in training.  *Burdine*, 450 U.S. at 254.  ARC disputes
that any disparity existed, but also argues that to the extent it

---

[9] *See supra* note 8.

did, it had no negative effect on Rogers's income or employment. *Cf. Hodgkins v. Kontes Chemistry & Life Sci. Products*, No. Civ.A. 98-2783, 2000 WL 246422 at * 9 (D.N.J. March 6, 2000)(denying summary judgment on plaintiff's allegation that supervisor retaliated against her for filing EEOC complaint by refusing to provide training, where training was necessary for job advancement).

In other words, ARC contests whether Rogers suffered any form of adverse employment action. "Although there are no bright-line rules defining an adverse employment action, New Jersey has looked for guidance to federal law dealing with Title VII and civil rights legislation to determine what constitutes an adverse employment decision in the contest of a LAD . . . claim." *See Schott v. State of New Jersey*, 2006 WL 1911375 at * 8 (App. Div. July 13, 2006).

In *Durham Life Ins. Co. v. Evans*, the Third Circuit defined "adverse employment action," stating that:

> "The Supreme Court has defined a tangible employment action as 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' . . . Although direct economic harm is an important indicator of a tangible adverse employment action, it is not the sine qua non.  If an employer's act substantially decreases an employees earning potential and causes significant disruption in his or her working conditions, a tangible adverse employment action may be found."

166 F.3d 139, 152-53 (3d Cir. 1999)(quoting *Burlington Indus. v.*

16

*Ellerth*, 524 U.S. 742 (1998))(holding that adverse employment action existed for purposes of determining employer's liability for hostile work environment created by supervisor in Title VII case); *see also Schott*, 2006 WL 1911375 at * 8 ("'not everything that makes an employee unhappy is an actionable adverse action'")(citations omitted).

Rogers cannot establish that the disparity in his training rises to the level of an adverse employment action.  There is no evidence that a certain level of training was required for promotion, retention or other benefits.  Rogers points to ARC records that he contends show that he received fewer calls on certain dates than his more highly trained white co-workers. (Pl. Br., Exs. Vol II., Ex. 1)  These records appear to encompass fewer than two dozen days over two years.  They do not indicate the type of equipment the CE was called to service for the customer.

The financial impact on Rogers does not appear to have been significant, if it even existed.  Rogers provides time cards for four weeks in 2003 in which he did not receive forty hours of "regular time" work.  (Pl's. Br., Exs. Vol II: Ex. 1) Even accepting that an economic impact felt in only four work weeks during the year is sufficient to establish an adverse employment action, these time cards give no indication why Rogers had less than forty hours of "regular time" work, nor do we know if other

17

employees with more training worked more hours in those weeks. Moreover, in several of those weeks Rogers was paid for "over time" and "double time" work.[10]

Given that Rogers cannot demonstrate that he suffered an adverse employment action, summary judgment will also be granted for ARC on Rogers' failure to train claim.  *Cf. Hodgkins*, 2000 WL 246422 at * 19 (summary judgment inappropriate where training was very important for job advancement and pay purposes).

## B.

Counts III and IV of Rogers's Complaint allege discriminatory discharge based on race and age, respectively, while Count V alleges discharge in retaliation for Rogers's filing of an EEOC complaint.[11]

### 1.  Discriminatory Discharge

In order to establish a *prima facie* case in a discriminatory discharge claim, a plaintiff must prove by a preponderance that: (1) he is a member of a protected class; (2) he performed his job

---

[10] Rogers also provides time cards for three weeks in 2002. The Court notes that these dates fall outside the two year statute of limitations for LAD claims.

[11] Although Rogers argues is his papers that the discriminatory discharge was based on both race and age, in Rogers's deposition testimony, he gives only age, and not race, as a reason for his termination.  *See supra* note 2.

in a satisfactory manner; (3) he was discharged; and (4) someone
else performed his job after he left.  *Baker v. Nat'l State Bank*,
312 N.J. Super. 268, 284 (App. Div. 1998) (discriminatory
discharge claim under NJLAD based on age and gender).  "[T]he
Third Circuit Court of Appeals has relaxed the fourth prong of
the *prima facie* case in the [reduction in force] situation, so
that a plaintiff whose position was eliminated need not show that
he or she was replaced, but must show that the employer retained
someone outside the protected class."  *Id.* at 289 (citing
*Marzano*, 91 F.3d at 503).

The first three prongs of the *prima facie* case are not
contested here.  As noted above, Rogers is a member of a
protected class.  Rogers contends that he was qualified for his
job and performed satisfactorily.[12]  Furthermore, it is not
contested that Rogers's employment was terminated.

Rogers cannot establish the fourth prong of his *prima facie*
case for discriminatory discharge, namely, that someone outside
his protected class was retained.  The record demonstrates that
there was a massive reduction in force at ARC following the loss
of the HP contract.[13]  Even assuming that Rogers's Exhibit 6,

---

[12] *See supra* note 8.

[13] The Court notes that Day and Walter lost or left their
jobs prior to Rogers's termination.  (Def. Br., Ex. D) Day
resigned on November 15, 2003, and Walter was terminated on
September 28, 2003, because his project was completed.  Moreover,
the record reveals that eighteen other CE's in Rogers's region

which he alleges is a list of "active employees" of ARC eight
months after Rogers was laid off, is admissible, this document
does not aid Rogers in establishing a *prima facie* case.  The
list, allegedly copied by Rogers from an ARC website that is no
longer accessible, provides no indication of where the named
people are employed, if they were retained after the cancellation
of the HP contract or were subsequently rehired, or their race or
age.

Rogers also argues that the most senior employees in most
regions were retained after the reduction in force, and at the
time he was terminated, he was the most senior employee in the
Moorestown office.  There is no evidence in the record to support
this assertion.  As such, summary judgment for ARC will be
granted on Rogers's discriminatory termination claims.[14]


2.  Retaliatory Discharge

Rogers also contends that he was terminated in retaliation
for his filing of an EEOC complaint in February, 2003.  A

_____

were also laid off on or about the same date that Rogers was
terminated.  (Id.)  This group included both white and African
American employees, ages ranging from nine years older to
thirteen years younger than Rogers.

[14] Alternatively, the Court concludes that Rogers cannot
establish that ARC's proffered legitimate, non-discriminatory
reason for his termination – the massive layoffs after the
company lost its HP contract – is pretextual.  *See* discussion
*infra* III.B.2.

plaintiff may establish a *prima facie* case in a claim of retaliatory discharge by demonstrating that: (1) he engaged in a protected activity known to the employer, (2) he was subjected to adverse employment action by the employer, and (3) there was a causal link between the protected activity and the adverse employment action. *El-Sioufi*, 382 N.J. Super. at 174-75; *Grazioli v. Genuine Parts Co.*, 409 F. Supp. 2d 569, 581 (D.N.J. 2005).

Rogers establishes the first two prongs of the *prima facie* case. Filing an EEOC complaint is unquestionably protected activity, and there is no indication that ARC was unaware of Rogers's complaint. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)(abrogated on other grounds by *Burlington N. & Santa Fe Ry. Co.*, 126 S. Ct. 2405 (2006)); N.J.S.A. § 10:5-12(d)(prohibiting "any person [from taking] reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act. . . ." ). Moreover, Rogers was laid off from his position with ARC.

Rogers has not demonstrated a causal link between the filing of the EEOC complaint and his termination, and thus cannot establish a *prima facie* case of retaliatory discrimination. Temporal proximity between the protected activity and the adverse

employment action can be circumstantial evidence of causation, as it is often "'sufficient to raise the inference that [the plaintiff's] protected activity was the likely reason for the adverse action.'"  *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir. 1997); *Grazioli*, 409 F. Supp. 2d at 582.  A plaintiff may also establish causation, even where there is a lack of temporal proximity, with "circumstantial evidence of a 'pattern of antagonism' following the protected conduct," *Kachmar*, 109 F.3d at 177, or other evidence such as "inconsistent reasons for termination, evidence casting doubt on reasons proffered for termination, and a change in demeanor after a complaint of discrimination."  *Watkins v. Nabisco Biscuit Co.*, 224 F. Supp. 2d 852, 872 (D.N.J. 2002).

Rogers has not presented evidence to establish sufficient temporal proximity or a pattern of antagonism, nor does the record otherwise raise the inference that his filing of the EEOC complaint was the likely reason for his termination.  *See Grazioli*, 409 F. Supp. 2d at 582 ("'The proffered evidence, looked at as a whole, may suffice to raise the inference [of causation],'. . . including evidence that the employer's explanation for the adverse action was pretextual.").

Rogers filed the EEOC complaint in February, 2003, and was laid off in December, 2003.  In the intervening months, ARC lost its contract with HP and had to lay off all of its employees in

the Mid-Atlantic region who serviced the HP contract, except for two employees in North and South Carolina who were retained for several additional weeks at the request of HP.  As discussed above, Rogers has not raised a material issue of fact whether ARC retained some of its employees after the loss of the contract. Although there are no set parameters for temporal proximity, the gap of nearly ten months does not support an inference of causation.

Rogers also contends that there was a pattern of antagonism leading up to his being laid off by ARC that suggests that retaliation was the true motive for his termination.[15]  Rogers maintains that he was not asked to commute to Baltimore or Washington, D.C., until after he filed his EEOC complaint.  He alleges that after he filed the complaint, he was sent to Baltimore for the first time and Washington, D.C., for three days.  He contends that ARC tried to "trap him into insubordination" by sending him to service calls outside of his commuting area, as the company used long commuting distances as a way to force employees to resign.

---

[15] The Court notes that Rogers's Complaint does not include a claim of retaliation based upon actions other than his ultimate termination.  Rogers's First Amended Complaint alleges that "Defendant Alternative Resources Corp. discharged Plaintiff because he complained of the wrongful actions of the Defendant, which was in violation of his employment rights."  (Compl. Count V, ¶ 2.)  The Court will consider Rogers's allegations of other retaliatory actions only in support of his claim of retaliatory discharge, and not as an independent claim.

Rogers's evidence does not establish a pattern of antagonism sufficient to give rise to an inference that he was laid off in retaliation for filing an EEOC complaint.  He points to three isolated incidents in which he was asked to travel outside his commuting area.  Rogers acknowledges that other employees who had not engaged in protected activity were asked to commute outside their normal area.  Moreover, his allegation that ARC used long commutes as a way to force out employees is completely unsupported by the record.

Alternatively, even if the Court accepts that Rogers has demonstrated causation by showing a pattern of antagonism after the filing of his EEOC complaint, Rogers cannot establish that ARC's proffered legitimate, nondiscriminatory reason for his termination is pretextual.  ARC maintains that it terminated Rogers as part of a large reduction in force after it lost its contract with HP.  As discussed above, Rogers has not raised a material issue of fact regarding whether ARC terminated all of its CEs and other employees in the Mid-Atlantic region.  He has not pointed to any evidence otherwise undermining ARC's proffered reason or suggesting that ARC acted with a retaliatory motive.  As Rogers has not demonstrated any "weakness, implausibilities, inconsistencies, incoherencies, or contradictions" in ARC's stated reason so that this Court could conclude that ARC's explanation is "unworthy of credence," summary judgment will be

24

granted for ARC on his retaliatory discharge claim.  *Fuentes*, 32 F.3d at 765.

## IV.

For the reasons set forth above, the Court will grant Defendant Alternative Resource Corporation's Motion for Summary Judgment.  The Court will enter an appropriate order.


Date: July  27 , 2006

                              s/*Joseph E. Irenas*
                              _____
                              JOSEPH E. IRENAS
                              Senior United States District Judge

25